### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
-----------------------------x
EDWIN GARCIA,                 :
                  Plaintiff,  :
                              :
V.                            :   CASE NO. 3:95CV00279(AWT)
                              :
CITY OF HARTFORD POLICE       :
DEPARTMENT, JOSEPH CROUGHWELL,:
ROBERT CASATI, TIMOTHY HOGAN, :
TIMOTHY PALMER and JAMES      :
BLANCHETTE,                   :
                              :
                  Defendants. :
-----------------------------x
```

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Edwin Garcia("Garcia"), brings this action against the defendants, the City of Hartford Police Department (the "Police Department"), and former Chief of Police Joseph Croughwell ("Croughwell"), former Deputy Chief Robert Casati ("Casati"), former Internal Affairs Commander Timothy Hogan ("Hogan"), former Internal Affairs Commander Timothy Palmer ("Palmer"), and former Internal Affairs Investigator James Blanchette ("Blanchette") (collectively the "Individual Defendants"), all in their official and individual capacities.  In his substituted amended complaint, the plaintiff sets forth the following claims: Count One, as to the Police Department, Croughwell, Hogan, Palmer and Blanchette, violation of 42 U.S.C. § 1981, based on the denial of promotion; Count Two, as to the Police Department, violation of 42 U.S.C. § 1983; Count Three, as the Individual Defendants, violation of 42 U.S.C. § 1983; Count Four, as to the Police Department and Croughwell, violation of

Connecticut General Statutes § 46a-60; Count Five, as to the Individual Defendants, violation of Connecticut General Statutes § 46a-60(a)(5); Count Six, as to all defendants, intentional infliction of emotional distress; and Count Seven, as to the Police Department and Croughwell, violation of 42 U.S.C. § 1983, based on the First Amendment.[1]  The defendants have moved for summary judgment on all counts.  For the reasons set forth below, the defendants' motion for summary judgment is being granted.

## I.  FACTUAL BACKGROUND

Garcia was employed as a police officer by the Police Department, and he was also a state legislator representing Hartford.  Croughwell was the Chief of Police of the Police Department.  Blanchette was a police officer at the Police Department who investigated complaints filed with the Police Department's Internal Affairs Division (the "IAD").  Hogan and Palmer were commanders of the IAD.  Casati was the Deputy Chief of the Investigative Services Bureau of the Police Department.

---

[1] The court notes that the plaintiff makes arguements in his opposition with respect to a class of one equal protection claim and a due process claim, both under the Fourteenth Amendment. However, those claims are not in the plaintiff's substituted amended complaint, and the court declines to address those claims raised for the first time at the summary judgment stage. Also, see Engquist v. Oregon Department of Agriculture, 553 U.S. 591, 607 (2008) ("[i]n concluding that the class-of-one theory of equal protection has no application in the public employment context - and that is all we decide - we are guided, as in the past, by the 'common-sense realization that government offices could not function if every employment decision became a constitutional matter.'").

On April 23, 1994, plaintiff Garcia met with Jose Rodriguez ("Rodriguez") and others at a restaurant.  Thereafter, Cesar Cordero ("Cordero"), the owner of El Coqui Café (the "Café"), arrived and requested that Rodriguez, who had configured Cordero's computer, come to the Café because the computer had crashed.  The plaintiff accompanied Cordero and Rodriguez to the Café.  The plaintiff arrived at the Café at approximately 1:15 a.m.  At approximately, 2:27 a.m., Officer Donald Rodrique ("Rodrique") observed some busy activity at the Café even though it should have been closed at 2:00 a.m.  Rodrique found the Café door locked but observed that people were inside.  Rodrique intended to give the Café owner a warning, close the Café and send the people inside home.  Some time after Rodrique knocked on the Café door, Cordero arrived at the door.  When Rodrique asked Cordero to open the door, Cordero walked away.  Rodrique then called for assistance. Sergeant Richard Kemmett ("Kemmett"), Officer Ezequiel Laureano ("Laureano") and Officer Fierravanti arrived.  Rodrique observed patrons leaving the Café.  The officers knocked again on the Café door.  Some time later, an unknown individual opened the door for the officers and stated that Cordero was in the basement. Laureano proceeded to the basement and found Cordero.  Laureano also noticed the plaintiff in the basement.  The plaintiff was able to observe and listen to the officers upstairs in the bar area via surveillance monitors in the basement.  Cordero joined the officers upstairs.

-3-

The officers commenced their investigation in the Café.
During the investigation, Cordero was placed under arrest for
being uncooperative and because he was walking around the Café and
dimming the lights, which was hindering the officers'
investigation.  Cordero struggled with Kemmett and ran towards the
basement stairs.  Kemmett followed Cordero, and both Cordero and
Kemmett fell down the stairs and got into a scuffle.  At the time
of the scuffle, the plaintiff was present.  Rodrique arrived in
the basement and attempted to assist Kemmett with the arrest of
Cordero, while Laureno kept an unknown individual from interfering
with the arrest.  The plaintiff did not intervene in the scuffle
or assist Kemmett as he attempted to control Cordero.  Instead,
the plaintiff placed a phone call to Croughwell, Mayor Michael P.
Peters ("Peters") and Deputy Mayor Eugenio Caro ("Caro"), and
watched the arrest unfold.

Sometime thereafter, the plaintiff met with Croughwell,
Peters and Caro at the Police Department to discuss what the
plaintiff had witnessed at the Café.  The plaintiff claimed that
excessive force had been used against Cordero.  When the meeting
was over, the plaintiff and Croughwell agreed that no information
would be given to the press because an investigation of the
incident (the "April 23 Incident") would be commenced.  Sometime
thereafter, information was leaked to the local media, and on
April 28, 29 and 30, 1994, Hartford Courant articles revealed
details of the April 23 Incident.  The local media attempted to

-4-

contact the plaintiff for an interview, which he declined. However, an article was published reporting that Croughwell had stated that the plaintiff had overstated his complaint with respect to excessive force being used by Kemmett against Cordero. On May 4, 1994, the plaintiff held a press conference after he felt criticized by his employer in the press.  His reasons for speaking out were that he felt Croughwell had "bashed [him] in the papers," "hammered [him] in the press," "attacked [his] credibility" and tried to destroy his reputation, integrity and credibility in the community.  (Defs.' Mot. Summ. J. ("MSJ"), Ex. A (Doc. No. 227-1) Edwin Garcia Dep. ("Garcia Dep.") 412:6-23.)  A newspaper article was published shortly thereafter discussing, inter alia, how the plaintiff broke his silence, responded to Croughwell's remark about the plaintiff, and accused fellow police officers of bias and targeting a Hispanic bar.

Blanchette conducted an IAD investigation into the April 23 Incident that focused on three areas: (i) whether Cordero's arrest was lawful; (ii) whether Kemmett used excessive force; and (iii) whether the plaintiff acted properly.  On May 27, 1994, Croughwell sent the plaintiff a letter notifying him that he was being charged with violating the Police Department's Code of Conduct in connection with the April 23 Incident.  The plaintiff was charged with the following violations: (i) ". . . any act which tends to undermine the good order, efficiency and discipline of the department or which reflects discredit upon the department or any

member thereof, shall constitute conduct unbecoming an employee,"
and (ii) "[f]ailure to take appropriate action concerning illegal
activity, including vice conditions and/or to make a written
report of any such incident in which an employee is involved."
(MSJ, Ex. G (Doc. No. 220-1).)   The letter further stated that the
plaintiff's actions on April 23, 1994 and his subsequent public
statements undermined the "good order, efficiency and discipline"
of the Police Department.   (<u>Id.</u>)

On June 10, 1994, Croughwell sent the plaintiff a follow-up
letter stating that the plaintiff had failed to contact the Police
Department advocate to discuss the matter, and that a formal
hearing was scheduled for June 23, 1994.   The letter also provided
the plaintiff with the names of three individuals from whom he
could choose his hearing officer.   On June 16, 1994, the plaintiff
selected Assistant Chief Joseph Ward ("Ward") as his hearing
officer.

On November 13, 1994, Karla Krengel ("Krengel") worked as the
weekend assignment editor at WFSB Television ("WFSB").   She
visited the Police Department to meet with Sergeants Scott Vinci
("Vinci") and Robert Carlson ("Carlson") for the purpose of
building a working relationship with the Police Department.   When
she arrived at the Police Department she encountered the plaintiff
at the front window.   Krengel told the plaintiff who she was and
that she had a meeting with Vinci and Carlson.   The plaintiff told
her that neither of those officers was in the building, and the

plaintiff and Krengel began conversing.  After a while, Vinci arrived.  However, Krengel and the plaintiff continued with their conversation.  The plaintiff began asking Krengel about individuals who worked at the television station.  When they talked about an individual named Brian Garnett ("Garnett"), a reporter with WFSB, the plaintiff stated that he did not like Garnett because of a story Garnett wrote about the plaintiff right before an election.  The plaintiff then told Krengel that "you can tell Brian that if I ever see him somewhere that I'm gonna beat the - - - - out of him." (MSJ, Ex. T (Doc. No. 225-8).)  Krengel was shocked.  Also, as Krengel was engaged in this conversation with the plaintiff, she noticed that another officer was there at the time.  The conversation eventually ended, and Krengel then met with Vinci and Carlson, who had returned to the building.  On or about November 16, 1994, Krengel told Garnett about the plaintiff's statement.

On November 21, 1994, Garnett contacted IAD and filed a complaint against the plaintiff for making threats against him (the "November 13 Incident").  The investigation was assigned to Blanchette.  Blanchette and another IAD officer, Sergeant Drew, interviewed Garnett.  Garnett informed the officers about the statement made by the plaintiff to Krengel during Krengel's visit to the Police Department.  He told the officers that the plaintiff had told Krengel to pass on to Garnett that "if he ever sees him in a dark alley that he was going to kick his ass." (MSJ, Ex. S

-7-

(Doc. No. 227-7).)  Garnett also told the officers about an incident involving the plaintiff's neighbor, Dennis House ("House").  House was an anchorman for WFSB.  Garnett reported that House had overheard Garnett's conversation with Krengel and then informed Garnett that he lived in the same apartment building as the plaintiff and that the plaintiff made a threatening statement concerning Garnett to House when the plaintiff had seen House in the apartment building hallway.  Garnett informed the officers that although he had had no direct dealing with the plaintiff, he suspected that the plaintiff was upset about a story Garnett had written about the plaintiff.  On December 8, 1994, Krengel provided to IAD her sworn statement concerning the November 13 Incident.  On December 23, 1994, Garnett provided to IAD a sworn statement with respect to his complaint.

In or about October 1994, notice had been given regarding the exam for promotion to the position of Lieutenant.  In December 1994, a promotional exam for the position of Lieutenant was given and 46 sergeants took the exam.  On December 28, 1994, an eligibility list for the position of Lieutenant was established by the Director of Personnel, with 28 candidates, including the plaintiff, eligible for promotion.  That eligibility list had an expiration date of December 28, 1996.  (See MSJ, Joyce Chin Aff. ("Chin Aff.") (Doc. No. 213) ¶ 13, Sept. 9, 2010.)  On December 29, 1994, the Director of Personnel certified to the Police Department a list containing the names of the eligible

candidates ranked 1 through 13, to be used in filling 11 police Lieutenant vacancies.  The plaintiff was ranked 3.  On December 29, 1994, an interview notice was sent to the plaintiff. (Pl.'s Memo. Opp. ("Opp."), Ex. 13 (Doc. No. 237).)  Interviews were conducted on December 30, 1994.  Croughwell promoted eligible candidates ranked 1, 2 and 4 through 12, choosing not to promote the plaintiff and a white male who ranked 13.  Of the 11 candidates who were promoted, one was a black male and another was considered a Hispanic female.  On January 6, 1995, Croughwell notified the plaintiff that he had not promoted him to the position of Lieutenant.

On January 11, 1995, IAD contacted House about the November 13 incident.  House declined to provide a sworn statement.  He felt uncomfortable doing so because he lived in the same building as the plaintiff and felt intimidated by the plaintiff.  On January 12, 1995, Krengel provided IAD with a supplemental sworn statement, affirming that she had had no problem hearing the plaintiff when he made the remark about Garnett.  She affirmed that she was surprised the plaintiff "made such a statement in front of another person as clearly and loudly as he did." (MSJ, Ex. S.) Krengel also provided IAD with a computer memo from House to Marc Effron, the News Director/Vice President of News for WFSB, dated September 26, 1994:

> Marc - I feel I should relay to you a conversation I had with State Rep. and HPD Sgt. Edwin Garcia earlier today. When I ran into him, I said "How ya doing"? and he replied, "Not very well, thanks to that asshole friend of

> yours."   He said he was referring to Brian Garnett.
> Garcia then said "Wait till I get my fucking hands on him,
> then you'll have a story to put on the morning news."
> Dennis

(MSJ, Ex. S.)

Krengel expressed to the investigators fear for her own personal safety because of the plaintiff's position as a police officer, his threats to physically assault her co-worker, Garnett, and the fact that she was cooperating with the IAD investigation. Krengel identified Officer Steven DiBella ("DiBella") as the officer who had been present during her interaction with the plaintiff on November 13, 1994.  Blanchette reviewed a copy of the "Field Services Command Daily Roll" for November 13, 1994, and it reflected that DiBella and Officer Valerie Salsgiver had been assigned to the front desk.  Blanchette also reviewed the vistors' log, which did not reflect that Krengel had visited the Police Department.

On January 13, 1995, Blanchette and Palmer presented an affidavit in support of criminal prosecution of the plaintiff. The Chief State's Attorney determined there were insufficient grounds for criminal prosecution.

In or about February 1995, the plaintiff responded to a set of interrogatories through his attorney.  The plaintiff stated that he had no personal knowledge of Krengel and did not have a recollection of a conversation with Krengel related to Garnett. The plaintiff further responded that he did not recall a conversation with House, but that the statement being referred to

"sounds like a statement made in jest and not a derogatory comment." (MSJ, Ex. S.)

Hearings concerning the April 23 Incident were held on February 1 and 7, March 2, and April 4, 1995.  The plaintiff was represented by counsel.  Several witnesses were called, including the plaintiff.  Cordero declined to be interviewed during the investigation and did not file a complaint.  The plaintiff testified that although Cordero was in jeopardy during the scuffle with Kemmett, he did not intervene because he was not able to reach them in a timely manner.  The Police Department advocate maintained during the hearings that the plaintiff's inaction led to the physical confrontation.  The advocate further maintained that the plaintiff's oath of office placed him in a position where he was held to a higher standard, and that he should not have elected to remain in the basement office and "monitor any inappropriate action" by the officers.  (MSJ, Ex. J.)  The plaintiff's counsel maintained that there was no factual basis for the alleged violations, and that the plaintiff was not able to act because the incident occurred so quickly.

On March 13, 1995, the plaintiff filed a CHRO complaint alleging failure to hire, harassment and discrimination with respect to the terms and conditions of his employment commencing in September 1994 and that his race was a factor.  The plaintiff alleged three patterns of discrimination: (1) a "pattern of discrimination . . . by conducting internal investigations into

-11-

[his] conduct as a police officer when similarly situated white officers were not so investigated"; (2) "a pattern of discrimination . . . by leaking Internal Affairs Division investigation material, informational reports and testimony to the media regarding [him] in order to place [him] before the public in an unfavorable light"; and (3) a "pattern of discrimination . . . by selectively enforcing its discipline system and rules and regulations against [him] in comparison to similarly situated white officers who have engaged in the same or similar conduct." (MSJ, Ex. LL (Doc. No. 223-6).)

On March 22, 1995, Salsgiver provided a sworn statement to IAD; she affirmed that she had seen a female who identified herself as a reporter conversing with the plaintiff, but did not recall anything specific about the conversation.  DiBella provided a sworn statement averring that he had no recollection of what occurred on November 13, 1994.

On March 29, 1995, Palmer issued an IAD report to Casati on the IAD investigation into the November 13 Incident.  The report concluded that the investigative package should be forwarded for command review for possible violations of the Code of Conduct by the plaintiff and by DiBella.  With respect to the plaintiff, the possible violations were conduct unbecoming of an employee and using unnecessary, violent, abusive or profane language to citizens while on duty.  With respect to DiBella, based on the conclusion that his claim not to have heard or observed a

conversation between the plaintiff and Krengel was disputable, the possible violation was knowingly making a false statement in a departmental or other official report or record.

On April 6, 1995, Ward submitted his findings from the hearing on the charges arising out of April 23 Incident.  Ward determined that although there were factual discrepancies and contradictions on both sides, the basic facts were clear.  Ward stated:

> . . . After the police arrived, [Garcia] knew that they were there and elected not to intervene or make his presence known but to "monitor" their actions from the basement office.  If Sergeant Garcia had acted while the police were outside, during the struggle in the basement or at any point in between, the situation could not have escalated to the point that it did.
>
> If, as the Union maintains, Mr. Cordero was being brutalized while he was lying perfectly still and not resisting, Sergeant Garcia would not have yelled, "Be still. Be Still." to Mr. Cordero.  In either case, whether Mr. Cordero was resisting arrest or being brutalized, Sergeant Garcia should have taken action.
>
> Sergeant Garcia's statements to the press were totally inappropriate and violated the media policy of the Hartford Police Department.  His statements did bring discredit upon the Hartford Police Department, the Chief of Police and individual members of the Police Department.
>
> Recommendations:
>
> A review of Sergeant Garcia's disciplinary file revealed that this is the second time that he was charged with violating Article I, Section 1.00. As a result of the first charge, he received a two day suspension.  In light of this and the seriousness of these charges, as well as the adverse effect his actions have had on the Hartford Police Department, I am recommending that Sergeant Garcia be demoted to Police Officer.

(MSJ, Ex. J. p. 23.)

On April 10, 1995, Croughwell notified the plaintiff of the findings.  Croughwell informed the plaintiff that he concurred with Ward's findings but did "not concur with the penalty recommended."  (MSJ, Ex. K (Doc. No. 221-1).)  Instead, Croughwell ordered a suspension for a period of 30 working days, commencing on April 17 and continuing through May 29, 1995.  On or about April 11, 1995, the plaintiff filed a discrimination complaint with the EEOC alleging Title VII violations based on his national origin.

On April 24, 1995, Croughwell notified the plaintiff that he was charged with two violations in connection with the November 13 Incident, (i) "[c]onduct unbecoming of an employee" and (ii) "[u]sing unnecessary, violent, abusive or profane language to citizens while on duty."  (MSJ, Ex. W (Doc. No. 225-10).)

In May 1995, Croughwell intended to fill five police Lieutenant vacancies, using the December 28, 1994 promotion eligibility list.  The Director of Personnel certified to the Police Department a list that contained the names of the eligible candidates ranked 3 (i.e., the plaintiff) and 13 through 18. Interviews were conducted with all the candidates except the plaintiff, who had already been interviewed in December 1994. Croughwell promoted the candidates ranked 13 through 17.  All were white males, as was the candidate who was ranked 18.  On May 18, 1995, Croughwell notified the plaintiff that he had not been promoted to the position of police Lieutenant.  On June 12, 1995,

-14-

the CHRO dismissed the plaintiff's complaint on the grounds that
"[t]here is no reasonable possibility that further investigation
of [his] complaint will result in a finding of reasonable cause."
(MSJ, Ex. NN (Doc. No. 224-2).)

On September 22, 1995, Croughwell sent the plaintiff a
follow-up letter with respect to the April 24, 1995 letter,
notifying the plaintiff that a formal hearing was scheduled for
October 27, 1995 with respect to the November 13 Incident and
requesting that the plaintiff select a hearing officer to preside
over his hearing.  Hearings were held on November 1, 9, and 22,
1995.  Captain James Flaherty ("Flaherty") presided as the hearing
officer and the plaintiff was again represented by counsel.
Several witnesses were called including the plaintiff, House,
Krengel and Garnett.  The plaintiff testified that he did not know
Krengel and that he had never spoken to her or made any statement
or threat to her.  The plaintiff denied having a conversation with
House and testified that if he had made a statement to House "it
would have been made in jest." (MSJ, Ex. Y (Doc. No. 227-8).)

On or about November 28, 1995, Flaherty submitted his
findings from the hearing and determined that the plaintiff was
"guilty of the violations charged in this matter." (MSJ, Ex. Y.)
Flaherty recommended that the plaintiff receive a written
reprimand and a 45-day suspension.  On December 18, 1995,
Croughwell notified the plaintiff of the findings, and ordered
that the plaintiff be suspended for 45 calendar days, from

-15-

January 14 through February 27, 1996.  In addition, the plaintiff received a written reprimand for using violent language during his conversation with Krengel.

The plaintiff was arrested on or about June 25, 1996 on charges unrelated to the April 23 Incident and the November 13 Incident.  Thereafter, the plaintiff was convicted of a felony and, on January 3, 1997, the plaintiff sent in his letter of resignation from the Police Department.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.  Only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  See <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)(quoting <u>Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  <u>Stern v. Trustees of Columbia University</u>, 131 F.3d 305, 315 (2d Cir. 1997) (quoting <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir.

1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  <u>Anderson</u>, 477 U.S. at 252.

## III. DISCUSSION

### A.   Count One (§ 1981 Claim against the Police Department, Croughwell, Hogan, Palmer and Blanchette)

As to the official capacity claims against Croughwell, Hogan, Palmer and Blanchette, by bringing suit against these Individual Defendants in their official capacities, the plaintiff brings suit against the City of Hartford (the "City").  <u>See</u> <u>Brandon v. Holt</u>, 469 U.S. 464, 472 n.21 (1985) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").  Accordingly, the claims in Count One against the Individual Defendants except Casati (who is not named in Count One) in their official capacities are treated as claims against the City.

"A claim for violation of § 1981 rights by a state actor must be pled as a § 1983 claim based on a violation of § 1981. <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701 . . . (1989). Because the City is a municipality of the State of Connecticut, the [plaintiff] should have pled [his] § 1981 claim under § 1983. <u>Anderson v. Conboy</u>, 156 F.3d 167, 176 n. 17 (2d Cir.1998)." <u>Timmons v. City of Hartford</u>, 283 F. Supp. 2d 712, 716 n.1 (D. Conn. 2003).  Therefore, the motion is being granted as to Count

-18-

One with respect to the Police Department and the Individual Defendants except Casati (who is not named in Count One) in their official capacities.

As to the individual capacity claims[2] against the Individual Defendants except Casati, the defendants contend that service of process was improper. They argue that service of process was sent to each Individual Defendant's place of employment and not to his personal dwelling, so the court lacks personal jurisdiction over the Individual Defendants in their individual capacities. The plaintiff contends that the defense of insufficient service of process has been waived. The court agrees.

"Federal Rule of Civil Procedure 12(h)(1)(B) provides that '[a] party waives any defense listed in Rule 12(b) (2)-(5) [which include, inter alia, insufficient service of process] by ... failing to either (i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.'" Cuello v. Lindsay, 2011 WL 1134711, *1 n.2. (E.D.N.Y. March 25, 2011). Here, the Substituted

---

[2]The court notes that because the Individual Defendants were acting under color of state law, they would be deemed state actors for purposes of § 1981, and any claim against them in their individual capacity would need to be brought under § 1983. See, e.g., Whaley v. City University of New York, 555 F. Supp. 2d 381, 400 (S.D.N.Y. 2008)("The holding in Jett has been interpreted to encompass not only governmental entities, but also individuals sued in their individual capacities who are 'state actors.'"); Victors v. Kronmiller, 553 F. Supp. 2d 533, 542 (D. Md. 2008)(noting Jett applies to suit against state actor in individual capacity). Nonetheless, the court addresses the claim pursuant to § 1981 as if the plaintiff had properly pled his claim.

Amended Complaint (Doc. No. 96) was filed on May 22, 1996.  The
defendants filed a motion for judgment (Doc. No. 100) with respect
to the Individual Defendants that raised only the argument that
the Individual Defendants were not decision-makers with respect to
the plaintiff's promotion.  The defendants effectively waived any
defense under Rule 12(h)(1)(B) by failing to assert a Rule
12(b)(4) defense in their motion for judgment.

     "To establish a claim under 42 U.S.C. § 1981, the plaintiff[]
must allege facts supporting the following three elements: (1)
that the plaintiff[] [is a] member[] of a racial minority; (2)
that the defendant intended to discriminate against the
plaintiff[] on the basis of [his] race; and (3) that the defendant
discriminated concerning one of the statute's enumerated
activities." Timmons v. City of Hartford, 283 F. Supp. 2d 712,
717 (D. Conn. 2003). "Section 1981 only prohibits intentional
racial discrimination." Id.  "The enumerated activities in Section
1981 include the rights 'to make and enforce contracts, to sue, be
parties, give evidence, and to the full and equal benefit of all
laws and proceedings for the security of persons and property.'"
Id. "[A]n essential element . . . is a requirement that the
alleged discrimination took place because of the individual's
race." Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d
1085, 1088 (2d Cir. 1993).  "[Section] 1981 . . . can be violated
only by purposeful discrimination." General Building Contractors
Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982).

The plaintiff contends that he was discriminated against based on his race (i) when he was denied a promotion in December 1994 and May 1995, and (ii) when IAD investigations were conducted against him.

With respect to the promotion, the plaintiff contends that he was denied a promotion in December 1994 and May 1995 on the basis of his race.  The plaintiff points out that he was not promoted despite (i) being the highest ranked Hispanic on the promotional list, (ii) the Police Department's affirmative action goal of promoting Hispanics, and (iii) the Police Department's policy of hiring employees who are residents of Hartford, which none of those promoted were.  However, none of these points creates a genuine issue of material fact as to whether the plaintiff was denied a promotion because of his race.  The plaintiff further contends that there is no evidence that he was passed over for promotion for "valid, performance-related reasons, pursuant to City policy and regulation." (Opp. 6.)  The plaintiff points to conclusory assertions within his affidavit to support these contentions.

There is no genuine issue of material fact as to whether the plaintiff was discriminated against because of his race.  The promotional process consists of the following: (i) the Director of Personnel certifies to the appointing authority, usually the department head, the names of eligible individuals from the promotion eligibility list - - always certifying two names more

-21-

than the number of vacancies; (ii) the department head holds interviews of eligible individuals selected from the list; and (iii) the department head makes appointments from the list and in doing so is free to select any of the individuals on the list and reject any two individuals on the list, and is not required to select the highest ranked candidates.  "Higher ranking on an eligibility list does not entitle one candidate preference over another, but only ensures that the highest ranked candidates will be certified to the appointing authority list."  (Chin Aff. ¶ 10.)  There were other police officers who were Hispanic and received promotions.  The record reflects that (i) on September 26, 1994, Croughwell appointed three police captains and three police lieutenants to deputy chief (two black and one Hispanic); (ii) on December 18, 1994, Croughwell appointed six police officers to detective (three Hispanic and one black); (iii) in the December 1994 promotions to lieutenant, Croughwell appointed eleven sergeants to lieutenant (one Hispanic and one black);[3] (iv) in the May 1995 promotions to lieutenant, Croughwell appointed five sergeants to lieutenant (all white); and (v) in 1996, Croughwell appointed eleven sergeants to lieutenant (two Hispanic).  (See MSJ, William Vernille Aff. (Doc. No. 217), Sept. 28, 2010.)

_____

[3]The plaintiff contends that the Hispanic individual who was promoted to lieutenant in December 1994 was not Hispanic. However, the officer avers that her ethnic background is Polish and Puerto Rican.  (See MSJ, Ex. E (Doc. No. 218) Katherine Perez Dep. 7:24.)

The record demonstrates that nondiscriminatory reasons existed for refusing to promote the plaintiff.  At the time of the December 1994 promotions, the plaintiff was awaiting a hearing on departmental charges arising out of the April 23 Incident, and he was also the subject of an ongoing IAD investigation into the November 13 Incident.  At the time of the May 1995 promotions, the plaintiff was serving a suspension in connection with the April 23 Incident and had received official notification that he had been charged with two violations arising out of the November 13 Incident, for which no hearing had been held.  In connection with the first round of promotions, in December 1994, Croughwell met with deputy chiefs who recommended that the plaintiff not be promoted.  Croughwell avers that he considered, with respect to all candidates, information "relative to discipline, sick time, complaints against them."  ((MSJ, Ex. B (Doc. No. 227-2.) Joseph F. Croughwell Dep. ("Croughwell Dep.") 310:9-10.)  He avers that he was aware that the plaintiff had two incidents pending at the time of the promotions and "just felt it would have been very embarrassing to the department . . . had he been promoted at that time and then had these matters proved to be sustained."  (Id. 310:16-19.) He further avers that "if everything alleged proved to be sustained and prior to that, knowing full well that those issues were pending, he was promoted[,] I think that would have been embarrassing to the department and also show some very unsound decision making on my part."  (Id. 313:23-314:4.)

-23-

Croughwell avers that the same process was used for the second round of promotions, in May 1995, except for meeting with the deputy chiefs.  (See id. 320:9-18.)  Patricia Washington, the Director of Personnel, avers that Croughwell told her in connection with the plaintiff and the December 1994 promotions that "he could not go forward and make this appointment because it would go against the policies of the department because some violations had taken place and because of additional potential violations that would be brought forth."  (MSJ, Ex. D (Doc. No. 227-4) Patricia Washington Dep. 81:14-24.)

With respect to the May 1995 promotions, Croughwell avers that the plaintiff's situation had not changed and Croughwell had not changed his decision.  Croughwell further avers that an additional reason the plaintiff could not be promoted during the second round was the fact that the plaintiff was suspended during the promotion period.  He avers that being suspended meant that the plaintiff had lost all authority and responsibility as a police officer.  Croughwell avers that he could not select the plaintiff during the second round, and that he would not have done so in any event.  Joyce Chin, former Principal Personnel Analyst, avers that "[i]n accordance with Rule 11, Section 22 of the City of Hartford Personnel Rules and Regulations, an employee under suspension is considered separated from the classified service for the period of his/her suspension."  (Chin Aff. ¶ 23.)

The plaintiff submitted a transcript of a January 16, 1995 discussion he and his attorney had with Croughwell after the first round of promotions.  The transcript reflects Croughwell's concern about the IAD investigation and the potential for embarrassing the Police Department.  It further reflects that Croughwell wanted the plaintiff to get the IAD investigation resolved as soon as possible.  Croughwell said:

> . . . get this hearing thing squared away, and then I will be able to reconsider appointing you. . . .
>
> . . .
>
> I think you would have made the same decision if you were sitting in my chair. It was not an easy decision for all the reasons that you brought up . . . .

(Opp., Ex. 15.)

During the deposition of the plaintiff's expert, Leonard Territo ("Territo"), Territo testified that "if an officer is suspended, typically the credentials are taken away and the officer has no more authority at that point than any other citizen does."  (Defs.' Reply (Doc. No. 244) Ex. B, Leonard Territo Dep. 98:4-7.)  Territo also testified, in response to a question as to whether a suspended officer can be promoted, that "[i]f you are not a member of the police department at that time and the chief makes a decision to go forward with promotions at that time without withholding any position in abeyance, th[e]n at that time you can't be promoted, if he makes the decision to promote during that suspension."  (Id. 99:16-21.)

-25-

With respect to the IAD investigations, the plaintiff
contends that the Individual Defendants (except Casati) "carried
out, instrumented and orchestrated a series of Internal Affairs
Division investigations into plaintiff's activities which were
frivolous in nature, but were pursued vigorously against him for
the purpose of casting aspersions on his character."  (Opp. 10-
11.)  The plaintiff further contends that "to the best of his
knowledge and belief, Officer Blanchette used his influence to
assist suspects arrested in other matters in return for alleged
evidence from these suspects against [the plaintiff]" during the
IAD investigations, and although Croughwell was notified of
Blanchette's improprieties he "took no action to remedy them but
allowed the investigation to continue."  (Opp. 11.)  The plaintiff
points to conclusory assertions in his affidavit to support these
contentions.

The function of the IAD "is to investigate allegations of
misconduct involving members of the Hartford Police Department."
(MSJ, Ex. (Doc. No. 212) Neville Brooks Aff. ¶ 8, Oct. 1, 2010.)
Neville Brooks, the current IAD commander, affirmed that there
were nine IAD investigations against the plaintiff.  (See id. ¶¶
12-20.)  With respect to the filing of complaints, Croughwell
averred that an investigation is started after a formal citizen
complaint but is forwarded to the corporation counsel's office to
determine if "there was any reason to investigate before we
actually went out and investigated."  (Croughwell Dep. 96:6-13.)

-26-

He further averred that the IAD commander would assign investigators to the complaint. (Id. at 96:22.)

The plaintiff averred that his IAD investigations were investigated by either "Sergeant Drew" or Blanchette. He averred that "Sergeant Drew" would come back on some cases "unfounded" or "no proof" but Blanchette would "come back yes and attempt to prosecute me." (Garcia Dep. 107:20-108:8.) However, the record does not support such a contention nor a contention that Blanchette attempted to prosecute the plaintiff because of his race. The record reflects that out of the nine investigations against the plaintiff, the plaintiff was found guilty in two instances, namely, with respect to the April 23 Incident (case # 94-15) and the November 13 Incident (case # 95-35). With respect to the April 23 Incident, the plaintiff affirms that he witnessed the "pummeling" of Cordero after he was pushed down the stairs by Kemmet and immediately contacted Croughwell, Peters and Caro to notify them that the officers used excessive force. (Garcia Aff. ¶ 77-79.) With respect to the April 23 Incident and the plaintiff's actions, Croughwell averred that "if you're witnessing a fight and you believe that a police officer is abusing somebody, you have an obligation as a police officer to stop it. If you're witnessing a fight and that isn't the case but the person is assaulting a police office, you have an obligation to assist the police officer. So either way [Garcia] was wrong, no matter what story he gave me." (Croughwell Dep. 338:14-22.) With respect to

-27-

the November 13 Incident, the record demonstrates that the plaintiff denied knowing Krengel and having a conversation with her.  (See MSJ, Ex. Y.)  The record reflects that the plaintiff had a hearing officer of his choice for both hearings, was represented by an attorney of his choice during both hearings and was found guilty after a multiple-day hearing of evidence and testimony.  The record could not support a conclusion that the decision to investigate the plaintiff and/or the findings of guilt that resulted from the IAD investigations were based on the plaintiff's race.

Thus, the plaintiff has not created a genuine issue of material fact as to whether he was discriminated against on the basis of his race when he was denied a promotion and had IAD investigations conducted against him.  Accordingly, the motion is being granted as to Count One with respect to the Individual Defendants (except Casati) in their individual capacities.

**B.   Count Seven (§ 1983 First Amendment Claim against the Police Department and Croughwell)**

"A municipal police department . . . is not a municipality nor a 'person' within the meaning of section 1983." Nicholson v. Lenczewski, 356 F. Supp. 2d 157, 164 (D. Conn. 2005).  "A municipal police department is a sub-unit or agency of the municipal government through which the municipality fulfills its policing function.  Because a municipal police department is not an independent legal entity, it is not subject to suit under

section 1983." Id. Accordingly, this claim is being dismissed with respect to the Police Department.

As to the official capacity claim against Croughwell, as noted above, by bringing suit against Croughwell in his official capacity, the plaintiff brings a claim against the City. Accordingly, the claims in Count Seven against Croughwell in his official capacity are treated as claims against the City.

"To support a claim that he was retaliated against for his speech, plaintiff must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action. . . . Speech is [on] a matter of public concern if relates to any matter of political, social, or other concern to the community." Baldyga v. City of New Britain, 554 F. Supp. 2d 268, 278 (D. Conn. 2008)(citations and internal quotation marks omitted). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999). "Where the speech is on a matter of personal interest only, the 'government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary . . . .'"

Baldyga, 554 F. Supp. 2d at 278 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

The plaintiff avers that as a result of defending himself in the local media about the April 23 Incident, he was discriminated and retaliated against by the defendants (i) "causing a series of internal affairs investigations to be conducted and fully carried out against me . . ."; (ii) "seeking warrants for my arrest based on allegations which were not of a serious nature and without allowing [me] to respond . . ."; (iii) "severely disciplining me for conduct of a nonserious nature . . ."; and (iv) "failing to promote me to the position of lieutenant . . ." (Garcia Aff. ¶ 88.)  The plaintiff avers that he had discussed matters of public concern.  However, the record reflects that the plaintiff's speech was made as an employee on matters of personal interest and not on matters of public concern.

The plaintiff avers that his reason for giving the press conference was because his employer bashed him, hammered him in the press, attacked his credibility, and tried to destroy his reputation.  (See Garcia Dep. 412:6-23.)  The plaintiff avers that "the only defense" he had to defend himself, and his reputation, integrity and credibility was to exercise his right to free speech by having the press conference.  (Id. 412:18-23.) In addition, the content of the speech was aimed to protecting the plaintiff's reputation in the community.  The plaintiff affirms that he and Croughwell agreed not to discuss the April 23 Incident because an

investigation was going to be commenced into the incident;
however, details of the incident were leaked to the local media.
He affirms that although he declined to comment or be interviewed
by the local media, Croughwell responded to the local media and
stated that the plaintiff had "overstated" his complaint of
excessive force.  The plaintiff affirms that the media reports
"were very negative in nature" as to him and he was "very
disturbed that the [April 23 Incident] received such a high public
profile."  (Garcia Aff. ¶¶ 84-85.)  The plaintiff affirms that he
"broke [his] silence" and spoke to the local media.  The plaintiff
further affirms that his "comments were on a matter of public
concern in light of the racial considerations and the previous
reporting on the incident."  (Id. ¶ 87.)  However, he then affirms
that he was discriminated and retaliated against "[a]s a result of
[him] defending himself in [his] comment to the local media on the
high profile incident."  (Id. ¶ 88.)  The record demonstrates that
the speech was to redress a personal grievance and was never a
matter of public concern.  See, e.g., Connick v. Myers, 461 U.S.
138 (1983)(finding district court erred determining internal
office questionnaire designed by plaintiff on office transfer
policy was matter of public concern); Huth v. Haslum, 598 F.3d 70
(2d Cir. 2010)(finding district court erred determining that
plaintiff's conveyance to supervisors of her subordinate's
concerns about co-worker conduct was a matter of public concern
because speech made pursuant to employee's official duties).

Thus, the plaintiff has not created a genuine issue of material fact as to whether he was retaliated against because he exercised his First Amendment rights.[4]  Accordingly, the motion is being granted as to Count Seven with respect to Croughwell in his official and individual capacities.

_____

[4]In any event, even assuming arguendo that the plaintiff has created a genuine issue of material fact as to this claim, "[q]ualified immunity protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  A defendant is entitled to summary judgment on qualified immunity grounds when it was "objectively reasonable for him to believe that his acts did not violate [the plaintiff's constitutional] rights." Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987); see also Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) ("The objective reasonableness test is met--and the defendant is entitled to immunity--if officers of reasonable competence could disagree on the legality of the defendant's actions." (internal quotation marks omitted)).  Put another way, the court must conclude that

> no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

Id. (internal quotation marks omitted).  Here, no reasonable jury could conclude that it was objectively unreasonable for Croughwell to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

**C.   Count Two (§ 1983 Claim against the Police Department)**

As noted above, the Police Department is not a person within the meaning of § 1983.  Accordingly, Count Two against the Police Department is being dismissed.

Nonetheless, had the claim been pled properly, Count Two would allege a <u>Monell</u> claim against the City.  <u>See</u> <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978).  "In <u>Monell</u>, the Supreme Court ruled for the first time that municipalities were liable under § 1983 to be sued as 'persons' within the meaning of that statute, when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom."  <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 190 (2d Cir. 2007). "Specifically, <u>Monell's</u> policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  <u>Id.</u> at 192.  <u>Monell</u> "made it clear that municipalities may not be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 120-21 (1992)(internal quotation marks omitted).

As discussed above, there is no genuine issue of material fact as to whether there was an underlying violation of the plaintiff's rights as alleged in Counts One and Seven, so there is no genuine issue of material fact as to whether a <u>Monell</u> violation

occurred.  See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)(district court decision not required to address Monell claim where there was no underlying constitutional violation).

In any event, the plaintiff contends that he was the victim of a discriminatory and retaliatory practice because of his race and/or exercise of his right to free speech.  In addition, the plaintiff contends that Croughwell acted as a final policy maker and implemented the following policies that violated his constitutional rights: (1) the "policy for evaluating examinations for promotion by establishing the policy or custom of conducting interviews, which ostensibly was against the Personnel Rules and Regulations of the City of Hartford"; (2) the "policy of promoting to the position of lieutenant all eleven of the thirteen persons who had been selected for promotion, although none of them were residents of Hartford and despite a policy of the City of Hartford to hire municipal employees who were residents of Hartford"; and (3) the "policy of promoting persons to lieutenant by rank in the examination, excepting only the Plaintiff". (Opp. p.26-27.)

With respect to a policy or custom of conducting interviews, the plaintiff provides inconsistent statements in his affidavit as to whether such a policy or custom was against the rules and regulations of the City.  The plaintiff affirms that "Croughwell conducted interviews of the candidates for Lieutenant including interviewing me, in violation of the Personnel Rules and Regulations of the City of Hartford."  (Garcia Aff. ¶ 24.)

-34-

However, the plaintiff then affirms that "[p]ursuant to the policies and procedures of the City of Hartford, all persons on such list should be notified of the fact that they were being considered for promotion and given the opportunity for an interview with Chief Croughwell." (Garcia Aff. ¶ 36.)  He also affirms that he "should have been given the opportunity to interview for the position with Chief Croughwell." (Garcia Aff. ¶ 38.)  In addition, Chin, the Director of Personnel, avers that "Rule VIII, Section 8-5 of the City of Hartford Personnel Rules and Regulations provides for interviews of eligibles on a certification list by the department head." (Chin. Aff. ¶ 9.)  Thus, there is no genuine issue of material fact as to whether there was a policy or custom of interviewing candidates in violation of the City's rules and regulations.

With respect to a practice or custom of Croughwell promoting employees who were not residents of the City in violation of a City policy, the plaintiff cites only to his own conclusory statements in his affidavit in support of this contention.  He does not cite to any evidence in the form of a document or record of the City, or any provision of the City's personnel rules and regulations, in support of that contention.  The defendants point to the fact that there is no such provision in the City's personnel rules and regulations, and note that Conn. Gen. Stat. § 7-460b provides: ". . . no municipality may require as a condition of employment with such municipality that an employee

whose position is subject to the terms of a collective bargaining agreement reached pursuant to sections 7-467 to 7-477, inclusive, reside in such municipality." Thus, there is no genuine issue of material fact as to whether Croughwell had a practice or custom of promoting individuals who were not Hartford residents in violation of a policy of the City.

With respect to the plaintiff's contention that the policy was that promotions were made strictly on the basis of the rankings, Chin avers that "[t]he department head need not choose the highest ranked candidate, as long as (s)he chooses from the certified candidates. Higher ranking on an eligibility list does not entitle one candidate preference over another, but only ensures that the highest ranked candidates will be certified to the appointing authority first." (Chin Aff. ¶ 10.) The plaintiff produces no evidence that the City's policy was otherwise. Thus, there is no genuine issue of material fact as to whether Croughwell violated City policy by not promoting strictly on the basis of the rankings.

### D.   Count Three (§ 1983 Claim against the Individual Defendants)

As to the official capacity claims against the Individual Defendants, as noted above, by bringing suit against the Individual Defendants in their official capacities the plaintiff brings suit against the City. Accordingly, the City is entitled to summary judgment as to any such claim for the reasons discussed in Part III.C. above.

-36-

Also, in light of the court's conclusion with respect to the plaintiff's other federal claims that there is no genuine issue of material fact as to whether there was a violation of any federal right of the plaintiff, the motion is being granted with respect to the claim in Count Three against the Individual Defendants in their individual capacities.

### E.    Count Four (Conn. Gen. Stat. § 46a-60) and Count Five (Conn. Gen. Stat. § 46a-60(a)(5))

"The state fair employment practices statute, [the Connecticut Fair Employment Practices Act ("CFEPA"),] General Statutes § 46a-60 through § 46a-62, is designed to eliminate certain discriminatory practices by employers in the hiring, promotion and discharge of employees." Civil Service Com'n of City of Waterbury v. Commission on Human Rights & Opportunities ex rel. Trainor, 195 Conn. 226, 229 (1985).

With respect to Count Four, the plaintiff contends that he was denied a promotion in violation of CFEPA.  "A plaintiff's efforts to establish the second element of a § 1981 claim[, that the defendant intended to discriminate against the plaintiff on the basis of race,] are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII . . ." DeSouza v. EGL Eagle Global Logistics LP, 596 F. Supp. 2d 456, 468 (D. Conn. 2009).  "Claims of racial discrimination under Title VII and CFEPA are analyzed using the same standard." Johnson v. C. White & Son Inc., 772 F. Supp. 2d 408, 413 (D. Conn. 2011).  The court's conclusion with respect to the § 1981 claim

in Count One that no genuine issue of material fact exists as to whether the plaintiff was discriminated against on the basis of his race when he was denied a promotion and had the IAD investigations conducted against him is dispositive of the plaintiff's CFEPA.  Therefore, the motion is being granted as to Count Four.

With respect to Count Five, the plaintiff contends that the Individual Defendants aided and abetted in discriminatory employment practices in violation of CFEPA § 46a-60(a)(5).  Conn. Gen. Stat. § 46a-60(a)(5) "provides that it is an unlawful discriminatory practice for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."  Cooke v. Prototype & Plastic Mold Co., Inc., 220 F. Supp. 2d 104, 111 (D. Conn. 2002).  "[A]bsent a discriminatory act the individual defendants cannot be subject to aiding and abetting liability under Conn. Gen. Stat. § 46a-60(a)(5)."  Jamilik v. Yale University, 362 Fed. Appx. 148, 149-50 (2d Cir. 2009).  Based on the court's decision on the plaintiff's discrimination claims, the motion is being granted as to Count Five.

F.   **Count Six (Intentional Infliction of Emotional Distress)**

The elements of a claim for intentional infliction of emotional distress are well-established.  "In order for the plaintiff to prevail . . . . four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000)(quoting Petyan v. Ellis, 200 Conn. 243, 253 (1986)). "Whether an actor's conduct is 'extreme and outrageous' is an issue for the Court in the first instance . . ." Id. "Only where reasonable minds disagree does it become an issue for the jury." Bombalacki v. Pastore, 71 Conn. App. 835, 839-40 (2002).  "In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. . . .  An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner."  Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 195 (D. Conn. 2000)(citation omitted).  "In addition to routine employment actions, Connecticut courts hold

that insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings do not support a claim for intentional infliction of emotional distress."  Id.

The plaintiff contends that although he was Hispanic and ranked third based on a competitive examination, he was passed over for promotion on two occasions.  He contends that such conduct constitutes extreme and outrageous conduct, particularly when considered in combination with the fact that he was subjected to internal investigations "followed by his arrest and suspension."  Opp. 39.  As a matter of the law, the evidence produced by the plaintiff is not sufficient to support a conclusion that any defendant engaged in extreme and outrageous conduct.

First, the plaintiff has failed to create a genuine issue of material fact as to whether he was denied a promotion or subjected to IAD interrogations because of his race, and also as to whether he was retaliated against for exercising his First Amendment rights.  Also, denying a promotion does not constitute extreme and outrageous conduct, particularly when the individual either has ongoing IAD investigations against him pending or is under suspension.  See, e.g., Bombalacki, 71 Conn. App. at 860 (finding hostile work relationship reflected in the media between plaintiff and employer which lead to failure to promote "was hardly extreme and outrageous"); Perodeau v. City of Hartford, 259 Conn. 729, 757

-40-

(D. Conn. 2002)(noting that "it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. . . . the mere fact of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed.").

Second, the plaintiff's suspension came after he was afforded a hearing at which he was represented by counsel and substantial evidence was presented against him.  Third, the plaintiff's arrest was unrelated to the April 23 Incident and the November 13 Incident and, in fact, unrelated to his employment as a police officer.

Accordingly, the motion is being granted as to Count Six.

## IV.  CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Doc. No. 209) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants as to all claims and close this case.

It is so ordered.

Dated this 26th day of September 2011 at Hartford, Connecticut.

```
                              /s/AWT
                        Alvin W. Thompson
                    United States District Judge
```

-41-